THE PEOPLE, *ex rel.* Cummings H. Tucker, *vs.* GEORGE
OPDYKE, Mayor of the city of New York.

The act of the legislature, "in relation to the city hall in the city of New
York," passed April 17, 1858, never took effect, and aside from the resolu-
tion of the board of supervisors; passed in November, 1861, requesting
the commissioners of the new city hall, appointed under that act, to take
charge of the construction of the new county court-house, such commis-
sioners never had any authority in respect to the construction of that
building.

The acts of 1861, 1862 and 1863 relate to another and different edifice, to
belong to the county of New York, and to be under the direction of the
board of supervisors, when completed.

The duty of the supervisors, under the last mentioned acts, to proceed with
the construction of the new county court house being clear, and they
having passed a resolution for the payment of the laborers employed
thereon, and a warrant for the amount allowed having been drawn by the
comptroller, which the mayor refused to countersign; *Held* that it was a
proper case for a peremptory *mandamus*, against the mayor.

THIS was an application for a peremptory writ of *man-
damus* to compel the mayor of the city of New York to
discharge a duty imposed upon him by the 6th section of the
act entitled "An act relating to the board of supervisors
of the county of New York," passed April 15, 1857, (*Laws
of 1857, vol. 2, p. 286,*) which provides as follows: "All
moneys drawn from the treasury, by authority of the board
of supervisors, shall be upon vouchers for the expenditure
thereof, examined and allowed by the auditor, and approved
by the comptroller, and no such moneys shall be drawn there-
from, except on the warrant drawn by the comptroller and
countersigned by the mayor and clerk of the board; and no
other warrant shall be necessary for such purpose." The
mayor refused to countersign a warrant drawn by the comp-
troller for moneys authorized by the board of supervisors to
be drawn from the county treasury pursuant to a previous
appropriation duly made of moneys sufficient to cover the
expense, the claims to be paid being county charges. The
moving papers showed that the relator was the holder, by
assignment, of the claims of certain laborers against the

The People *v.* Opdyke.

county, for work and labor done by them upon the new court house in the park. They were hired to do the work by the board of supervisors, who were then engaged, as claimed, under authority in them vested by law, in erecting and constructing the new court house. The hiring was on the first of May. The services were performed from the second to the sixteenth of May, inclusive. The claims had been duly verified, and, upon proper vouchers, audited and approved as required by law. The board of supervisors passed a resolution on the 22d of May, 1863, directing the comptroller to pay the claims from the money previously appopriated for the purpose. The mayor vetoed the resolution, but at a subsequent meeting it was passed over the veto, by the requisite vote of the board. The comptroller accordingly drew his warrant, to the order of the county auditor, for the purpose of paying the claims, but the mayor refused to countersign it. It appeared also, by the relator's affidavit, that the new court house is being erected by the board of supervisors, upon land acquired and taken by them for the purpose of building a court house thereon, pursuant to the provisions of the act entitled "An act to enable the supervisors of the county of New York to acquire and take lands for the building of a court house in said county, passed April 10, 1861. The only question involved was whether on the 1st day of May, 1863, the board of supervisors of the county of New York were by law vested with authority to erect the new court house on the lands acquired and taken by them for the purpose, under the act of 1861. The court, at special term, directed a peremptory mandamus to issue, and the defendant appealed.

*D. D. Field,* for the mayor.

*L. B. Woodruff* and *J. H. Choate,* for the relator.

*By the Court,* LEONARD, J. The mayor refuses to countersign a warrant drawn by the comptroller for money author-

ized by the board of supervisors to be drawn from the county treasury pursuant to a previous appropriation, for services, &c., in the erection of the court house; the vouchers therefor having been examined and allowed by the auditor, and approved by the comptroller. The mayor insists that the board of supervisors had no authority to incur these expenditures; that the commissioners of the new city hall, appointed under an act entitled "An act in relation to the city hall, in the city of New York," passed April 17, 1858, are authorized exclusively to direct and superintend the construction of a court house on the land taken for that purpose in the city hall park, under an act passed in 1861. (*See Sess. L.* 1861, *p.* 451.)

The act of the legislature, before referred to, (*Sess. L.* 1858, § 1, *p.* 510,) required the mayor to nominate, and the board of supervisors to confirm three commissioners of the new city hall. The act further declared it to be the duty of the said commissioners to direct and superintend the erection of a building in the park, in the rear of the city hall, for the accommodation of the courts &c. (§ 2.) The board of supervisors were directed to raise a sum not exceeding $250,000, by the creation of a public stock, and the cost of the building, finished and furnished, ready for use, was limited to that sum. (§ 6.) It was made the duty of the chamberlain of the city and county of New York to pay the money so to be raised, in such sums and to such persons as the commissioners should from time to time direct. (§ 7.) It will thus be seen that commissioners were to be appointed to construct a city hall within the city hall park, on lands belonging to the city, and not to the county of New York; the title to the building to be constructed, following the title to the land, would be vested in the corporation of the city of New York, subject to the control of the common council.

There are certain duties imposed by law upon the board of supervisors in respect to the courts, and the furnishing of court rooms suitable and sufficient, which it would not be in

The People *v*. Opdyke.

their power to perform, except by the consent of the common council, if the title to and exclusive control of the building where the courts of the state were to be held were not vested in them. Commissioners were appointed under the act of 1858, but no money was raised, nor was any building constructed, or even commenced.

It is a matter of well known history, among the residents of the city of New York, that the common council of the city would never give their permission to the construction of the proposed building, upon the site named in the act referred to. More than three years elapsed, and not a stone was laid, or even a site secured for the much needed court house. I omit any reference to the act to enable the board of supervisors of the county of New York to levy a tax for county purposes and to regulate the expenditure thereof, passed in 1860, whereby they were authorized to raise by taxation, within the county, the sum of $100,000, for the purpose of erecting suitable court rooms, for the accommodation of the several courts of the county. (*Sess. L. ch.* 509, *p.* 1017.) It appears in no manner to illustrate the subject; nor does it appear that any action was ever taken under it; and if there was, it is not stated by whom, nor in what manner the money was expended. Nothing is declared by this act making it the duty of the commissioners to expend the money so to be raised, nor are they in any manner referred to.

For the purpose of securing a site for a new court house, the board of supervisors were authorized by the legislature, in 1861, to acquire and take for this purpose, such lands and premises, in the city and county of New York, as they might deem necessary. The supreme court were authorized to appoint three commissioners to appraise the value of the lands to be taken, in the same manner as commissioners of estimate and assessment are required to be appointed for the purpose of opening public squares, streets or avenues in the city of New York. (*Sess. L.* 1861, *ch.* 161, *p.* 451.)

The board of supervisors were also authorized by this act

to raise the amount required to defray the damages or compensation awarded by the commissioners to the owners of the lands to be acquired, and all other sums required to be expended in carrying out the provisions of the act, by the creation of a public stock, to be called the court house stock, and the board were also authorized to raise annually, by tax, a sum in addition to the ordinary taxes, sufficient to pay the interest annually accruing on the said stock. The manner of raising the funds to defray the damages for taking the land, and the other expenses to be incurred under the act of 1861, were repealed at the next session of the legislature, in 1862, and provision was then made for these expenses, as well as for other matters in connection with the subject of the new court house, to which reference will shortly be made.

The board of supervisors were also authorized by the legislature, in the act authorizing the levy of the tax for the year 1861, for county purposes, (*Sess. L. p.* 564,) to raise $50,000 for the construction of the new court house.

No reference is made by the legislature, in 1861, to the existence of such a body of men as the commissioners of the new city hall. There is no duty prescribed for them in relation to the new court house.

Under the act of 1861, land was taken belonging to the corporation of the city of New York, in the manner directed, and the board of supervisors commenced and continued the construction of the new court house, on the site so acquired, until November, 1861; when they, by resolution, requested the commissioners of the new city hall to take charge of the construction of the court house, and directed the committee of the board of supervisors, having the matter in charge, to transfer the same to the commissioners, and to facilitate the prosecution of the work, under their direction. The commissioners accepted the charge, and continued the construction of the building for several months, perhaps until late in the fall of 1862. On the 4th of December, 1862, the board of supervisors adopted a resolution rescinding the res-

olution of November, 1861, requesting the commissioners to take charge of the work, required all persons having claims for labor or materials furnished for the new court house to present them to be audited and paid, and directed the special committee of their board to proceed with the erection of the building. The mayor afterwards returned these resolutions with his objections, but the supervisors, after reconsideration, passed them on the 8th of January, 1863, by a majority of all the members of the board, notwithstanding the objections of the mayor.

The question in dispute in this proceeding, in my opinion, arises at this point: Do the act of 1858 and the act of 1861 relate to the same subject ? Without pausing to answer this inquiry here, we will examine the legislative acts of 1862 and 1863 for any further illustration which they can afford. The legislature, in 1862, passed an act entitled "An act to authorize the board of supervisors of the county of New York to raise money by loan, and to create a public fund or stock, to be called 'The New York county court house stock,' and to authorize the commissioners of the sinking fund to receive and purchase said stock." (*Sess. L.* 1862, *ch.* 167, *p.* 335.) The first section authorizes the board of supervisors to raise by loan, from time to time, a sum of money not to exceed $1,000,000, by the creation of a public fund or stock, to be called "The New York county court house stock." This act further provides, that the money to be raised thereby shall be applied by the said board of supervisors to the payment of the award made and confirmed by the supreme court, to the mayor, aldermen and commonalty of the city of New York, for the value of the land acquired for a court house, pursuant to the act of 1861, and to the erection of a court house on the said land; and for the payment of the said stock, the said land, and the building which shall be erected thereon, is irrevocably pledged. The board of supervisors are further empowered to raise by tax a sum sufficient to pay the annual interest, and installments of principal, when they shall

begin to fall due. The commissioners of the sinking fund are authorized to accept the stock in settlement of the award for the land taken from the corporation of the city of New York, for the court house site, to an amount equal to the award, and to invest the moneys of the sinking fund in additional amounts of the said stock, if these commissioners deem it expedient. ·

Certain sections of the act of 1861, providing for the payment of the damages to be awarded for the lands to be taken under that act for the location of a court house, are repealed, the act of 1862 providing for such payment in another manner. The commissioners of the new city hall are mentioned once only in the whole act. They are recognized as having the direction of the construction of the court house, and it is made their duty to appoint one of their number as treasurer, in connection with the construction of the court house, under their direction, and to perform such other duties as the board of commissioners shall provide. The treasurer, it is provided, shall be entitled to receive such salary as the board of supervisors shall prescribe.

The legislature, by an act passed April 8, 1863, entitled " An act to enable the board of supervisors of the county of New York to raise money by tax, and incur and audit claims for county purposes," direct that " the proceeds of all stock heretofore specially authorized by the laws of this state to be created and issued for the construction of buildings in said county shall be expended and applied only in discharge of claims when properly audited, and allowed as a county charge by said supervisors, who are hereby authorized and directed to superintend and construct said buildings."

The argument in this case consists chiefly in a careful analysis of the various statutes relating to the subject, and the present extended review of them I have been at some trouble to prepare for the purpose of ascertaining whether there is really any duty enjoined upon the commissioners of the new city hall since the act creating the commission in 1858. They

are mentioned once only subsequent to that date, and thus no duty is enjoined upon them in respect to the construction of the court house. Their only duty there prescribed is to appoint a treasurer. The board of supervisors had previously, in November, 1861, requested the commissioners to take charge of the construction of the new court house. They had complied with the request, and when the act of 1862 was passed, the commissioners were thereby recognized by the legislature as then in charge of the work. It was a board of upright and respectable gentlemen, and the board of supervisors might very well confer upon them an agency of so important a character.

There can be no doubt that the supervisors believed, at the time the commissioners were requested to take charge of the construction of the new court house, that the commissioners only had the legal right to perform that duty. They were, however, in my opinion mistaken. If the duty of directing and superintending the construction of the new court house, the site of which was authorized to be taken under the act of 1861, and the money for the erection of which was directed to be raised by the act of 1862, and the expenditure whereof was directed to be made by the supervisor, by the act of 1863, was not enjoined upon the commissioners by the act of 1858, it will be difficult, and I may say impossible, to derive such authority under the reference to them contained in the act of 1862. All that is there said in relation to the construction of the new court house by the commissioners would be as appropriate while they were acting as the agents of the board of supervisors as it would be if they derived their power and were acting by an undisputed right under the act of 1858.

The act last mentioned authorized the construction of a building upon land belonging to the corporation of the city of New York, and, when erected, the building would also be the property of the said city. It was to be called the city hall. The sum of $250,000 was to be raised for its construction, and that was to be the whole cost of the building, fin-

ished and furnished. That is the building, and that the fund of which the commissioners of the new city hall were charged with the management.

Whether it was in consequence of the refusal of the common council to permit such an edifice to be erected on their ground, as is probable, or from some other cause, the act never took effect. The building there authorized was never constructed, nor was it commenced. Aside from the resolution of the board of supervisors in November, 1861, the commissioners never had any authority about the construction of the new county court house. The acts of 1861, 1862 and 1863 relate to another and different edifice, to belong to the county of New York, and to be under the direction of the board of supervisors when completed. The code of procedure, (§ 28,) imposes a duty upon the supervisors, the performance of which the common council would possess the power to thwart or prevent, in respect to a building belonging to the corporation of the city of New York, if they should think proper to exercise that power.

The want of any express language in any of the various enactments of the legislature conferring the power or duty upon the commissioners of the new city hall to erect, direct or superintend the building of the county court house, and the alteration made after the passage of the law appointing the commissioners so as to vest the title in the new building to be constructed in the county instead of the mayor, aldermen and commonalty of the city of New York, as contemplated under the act of 1858, furnish sufficient evidence that the later acts refer to a different edifice from the one mentioned in the act of 1858, which the commissioners were to direct and superintend, and also warrant the legal conclusion that the commissioners have no right to interfere in the construction of the new county court house since the revocation of their agency by the resolution of the board of supervisors adopted in January, 1863.

It is perhaps worthy of remark that the legislature should

have omitted to repeal the act of 1858, when the power to construct a city hall, the title to which would be in the corporation of the city of New York, became so obviously inoperative. The public officers and the courts of the city and county of New York do not at this time require both a new city hall and a new county court house. The commissioners created under the act of 1858 have not been furnished with a site for the building, nor with the funds to erect it, and their office has become obsolete. Perhaps a repeal of the act was unnecessary. No argument can, however, be derived from that circumstance adverse to the conclusion here attained.

The duty of the supervisors to proceed with the construcsion of the new county court house is clear, and was so when the work was performed, for which the relator now demands payment.

Perhaps it will not be improper to add that the mayor has fallen into the misfortune of obstructing a much needed edifice, not from any blameworthy motive, but from adhering, as he had a right to do, to the written opinions of his lawfully constituted legal adviser.

The writ of mandamus must go, but without costs.

[NEW YORK GENERAL TERM, July 11, 1863. *Sutherland, Leonard* and *Clerke,* Justices.]